FILED'06 MAY 12 16:27 USDC-ORP

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| SCOTT HUGGETT, | ) | CV 05-635-HU |
| | ) | |
| Plaintiff, | ) | |
| | ) | FINDING AND |
| v. | ) | RECOMMENDATION |
| | ) | |
| JO ANNE B. BARNHART, Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

TIM WILBORN
WILBORN & ASSOCIATES, P.C.
2020-C SW 8th Avenue, PMB # 294
West Linn, Oregon 97068

    Attorneys for Plaintiff

KARIN J. IMMERGUT
United States Attorney
NEIL J. EVANS
Assistant United States Attorney
1000 SW Third Avenue, Ste 600
Portland Oregon 97204

1 - FINDINGS AND RECOMMENDATION

MICHAEL McGAUGHRAN
Regional Chief Counsel
RICHARD A. MORRIS
Special Assistant United States Attorney
Social Security Administration
701 5th Avenue, Ste 2900 M/S 901
Seattle Washington 98104

    Attorneys for Defendant

HUBEL, Magistrate Judge:

    Plaintiff Scott Huggett brings this action for judicial review of a final decision of the Commissioner of Social Security denying his application for disability insurance benefits (DIB) under Title II of the Social Security Act. The court has jurisdiction under 42 U.S.C. § 405(g). The Commissioner's final decision should be remanded for further administrative proceedings.

## BACKGROUND

    Huggett was born March 22, 1967. He completed high school and vocational training in automotive electronics at a community college. He worked as a merchandiser, tow-truck driver and pre-delivery inspection and water leak technician. He was healthy until October 2001 when he experienced a sudden onset of dizzy spells while working as a merchandiser for Pepsi. He stopped working because these episodes of dizziness limited his ability to drive.

    Huggett last worked on October 12, 2001. He alleges disability commencing that date due to dizzy spells, numbness, carpal tunnel syndrome, fatigue and memory loss which combine to limit his ability to drive, lift, work with his hands and remember work tasks. Tr. 58.[1]

---

[1] Citations to "Tr." refer to the page(s) indicated in the official transcript of the administrative record filed with the Commissioner's Answer.

## DISABILITY ANALYSIS

The initial burden of proof rests upon the claimant to establish disability. *Roberts v. Shalala*, 66 F.3d 179, 182 (9th Cir. 1995), *cert. denied*, 517 U.S. 1122 (1996). To meet this burden, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Commissioner uses a sequential process of up to five steps for determining whether a person over the age of 18 is disabled within the meaning of the Act. *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); 20 C.F.R. § 404.1520. Huggett challenges the ALJ's evaluation of the evidence and conclusions at steps three and five of the process.

At step three, the Commissioner must determine whether the claimant has impairments that meet or equal "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." *Yuckert*, 482 U.S. at 140-41; 20 C.F.R. § 404.1520(d). The criteria for these listed impairments, also called Listings, are enumerated in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Listing of Impairments). If the ALJ determines that the claimant's impairments meet or equal a Listing, the Commissioner will find the claimant disabled without completing the remaining steps in the sequence.

Here, the ALJ determined that Huggett's medically determinable impairments of "depression, conversion disorder, carpal tunnel syndrome, mild cervical disc bulge, headaches and status post right shoulder rotator cuff surgery" did not meet the severity criteria for any disorder in the Listing of Impairments. Tr. 23-24.

3 - FINDINGS AND RECOMMENDATION

If the adjudication proceeds beyond step three, the Commissioner must assess the claimant's residual functional capacity (RFC). The claimant's RFC is an assessment of the sustained work-related activities the claimant can still do on a regular and continuing basis, despite the limitations imposed by his impairments. 20 C.F.R. § 404.1545(a); Social Security Ruling (SSR) 96-8p.

The ALJ assessed Huggett's RFC as follows:

> The medical evidence supports a finding that the claimant retains the residual functional capacity to engage in light exertion. That is, he can lift and carry ten pounds frequently and twenty pounds occasionally.

Tr. 24-25.

At step five, the Commissioner must determine whether the claimant can perform work that exists in the national economy. *Yuckert*, 482 U.S. at 141-42; 20 C.F.R. § 404.1520(e), (f). Here the burden shifts to the Commissioner to show that a significant number of jobs exist in the national economy that the claimant can do. *Yuckert*, 482 U.S. at 141-42; *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999). If the Commissioner meets this burden, then the claimant is not disabled. 20 C.F.R. § 404.1566.

Here, the ALJ found that Huggett's RFC left him able to work at a significant number of jobs in the national economy. He identified four examples of such work, drawn from the testimony of the impartial vocational expert (VE): small product assembler, cannery worker, booth worker and mail clerk. The ALJ concluded that Huggett was not disabled or entitled to benefits.

## STANDARD OF REVIEW

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole. 42 U.S.C.

§ 405(g); *Batson v. Commissioner of Soc. Sec. Admin.,* 359 F.3d 1190, 1193 (9th Cir. 2004). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Andrews v. Shalala,* 53 F.3d 1035, 1039 (9th Cir. 1995).

The ALJ is responsible for determining credibility, resolving conflicts in the medical evidence and resolving ambiguities. *Edlund v. Massanari,* 253 F.3d 1152, 1156 (9th Cir. 2001). If the evidence can reasonably support either affirming or reversing the Commissioner's conclusion, the court may not substitute its judgment for that of the Commissioner. *Batson,* 359 F.3d at 1193. The Commissioner's decision must be upheld, even if the "evidence is susceptible to more than one rational interpretation." *Andrews,* 53 F.3d at 1039-40.

## DISCUSSION

Huggett contends the ALJ erred by finding that his impairments do not satisfy the criteria for any section of the Listing of Impairments.

Huggett contends the ALJ failed to assess his RFC accurately because he improperly discounted Huggett's testimony, the medical source statements of two treating physicians, the findings of agency consultants and the statement of his mother. In addition, Huggett asserts that the ALJ's RFC assessment did not reflect the finding that Huggett has moderate limitations in the ability to sustain concentration, persistence or pace.

Huggett contends the ALJ erred at step five by eliciting testimony from the vocational expert with a hypothetical question that did not accurately reflect all of his limitations.

I.  **Listing of Impairments**

Huggett contends the ALJ erred by failing to find that his impairments meet or equal Listing 12.07 *Somatoform Disorders*. The claimant has the burden of proving that he meets or equals the criteria for a listed impairment based on medical evidence. *Sullivan v. Zebley,* 493 U.S. 421, 431 (1990); *Tackett v. Apfel,* 180 F.3d at 1100; 20 C.F.R. § 404.1526. The ALJ must compare "the symptoms, signs and laboratory findings . . . shown in the medical evidence . . . with the medical criteria shown with the listed impairment." 20 C.F.R. § 404.1526(a). The claimant's description of symptoms alone is not sufficient to establish the presence of a physical or mental impairment. 20 C.F.R. § 404.1529(b); SSR 86-8.

Listing 12.07 *Somataform Disorder* refers to physical symptoms for which there are no demonstrable organic findings or known physiological mechanisms. The claimant can establish the required level of severity by showing that his symptoms result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or, repeated episodes of decompensation, each of extended duration. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.07B.

The ALJ found that Huggett failed to demonstrate equivalence with the Listing because no treating or examining physician made findings equivalent to the required severity criteria. He found that the medical records and opinions demonstrated only mild restrictions of daily activities, mild limitations in maintaining social functioning, moderate limitations in the ability to maintain concentration persistence or pace and no episodes of decompensation. Tr. 23.

In reaching these conclusions, the ALJ relied on state agency consulting psychologists who are recognized as experts in the evaluation of medical issues in disability claims under the Social

Security Act. The Commissioner relies on them to make findings of fact about the nature of a claimant's impairments and the severity of the functional limitations they impose. 20 C.F.R. § 404.1527(f); SSR 96-6p.

On October 9, 2002, Dick Wimmers, Ph.D, reviewed Huggett's medical records and completed a Psychiatric Review Technique Form in accordance with 20 C.F.R. § 404.1520a. Dr. Wimmer's findings were identical to those recited in the ALJ's decision regarding Huggett's degree of impairment in the four categories of function. Tr. 212. On May 1, 2003, Karen Bates-Smith, Ph.D., reviewed Huggett's medical records and affirmed Dr. Wimmer's findings. Tr. 202.

Accordingly, the ALJ's determination that Huggett did not meet the severity criteria for Listing 12.07 was based on the Psychiatric Review Technique required by 20 C.F.R. § 404.1520a and supported by substantial evidence. It should not be disturbed.

On remand, the Commissioner is not foreclosed from revisiting this issue if she finds it appropriate to do so.

## II.    RFC Assessment

### A.    Huggett's Credibility

Huggett testified that he cannot work because of dizzy spells, hand numbness and headaches. Tr. 385. The dizzy spells are accompanied by fuzzy vision and the sensation that he is about to pass out. They occur from three to ten times an hour and last about five to ten seconds. Tr. 361-62.

Huggett testified that three to five times a day, he experiences shooting pain from his forearm into his fingers accompanied by numbness in the hands. Tr. 363.

He testified that he experiences approximately four migraine headaches per week, each lasting in a range from about two hours to all day long. He treats these with self-administered

Imitrex injections and stays in a darkened room. He also has daily headaches that are less severe. Tr. 364. He did not experience these migraines during two periods while he was taking pain medication for a shoulder injury. Tr. 372, 374, 375.

Huggett testified that he can walk for a couple of blocks, more or less, depending on whether he has a dizzy spell. Tr. 378. His ability to stand is limited by dizzy spells to about 30 to 45 minutes at a time. Tr. 369. He can sit for about one hour before pain in the back, neck and legs make him uncomfortable. He was unsure of his lifting limitations because he had recently undergone shoulder surgery. Before the surgery, he could easily lift two cases of soda-pop weighing about 40 pounds. During his recovery from surgery he was able to lift 10 pounds and this was improving. Tr. 366-67, 370.

The ALJ found that Huggett's testimony was generally credible regarding the existence of impairments causing some degree of limitations; he did not believe that Huggett's impairments imposed functional limitations precluding the requirements of light work. Tr. 24.

If a claimant produces objective medical evidence of an underlying impairment that could reasonably be expected to produce the symptoms alleged and no affirmative evidence of malingering exists, the ALJ must assess the credibility of the claimant regarding the severity of symptoms. *Smolen v. Chater*, 80 F.3d 1273, 1281-82 (9th Cir. 1996); *Cotton v. Bowen*, 799 F.2d 1403, 1407-08 (9th Cir. 1986). This threshold requirement is known as the *Cotton* test.

If a credibility determination is necessary, the ALJ may discredit a claimant's testimony regarding the severity of symptoms by providing clear and convincing reasons for doing so. *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993); *Smolen v. Chater*, 80 F.3d 1273, 1283 (9th Cir. 1996). The ALJ may consider objective medical evidence and the claimant's treatment history as well as

8 - FINDINGS AND RECOMMENDATION

any unexplained failure to seek treatment or follow a prescribed course of treatment. *Smolen*, 80 F.3d at 1284. The ALJ may also consider the claimant's daily activities, work record and the observations of physicians and third parties with personal knowledge about the claimant's functional limitations. *Id*. In addition, the ALJ may employ ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms and other statements by the claimant that appear to be less than candid. *Id. See also* SSR 96-7p. The ALJ's findings must be sufficiently specific to permit this court to conclude that he did not discredit the claimant's testimony arbitrarily. *Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995).

The ALJ found Huggett's assertion that he cannot work untenable because "the totality of the medical records reveal the claimant is able to engage in basic work activities despite the limitations resulting from his physical and mental impairments." Tr. 24. The ALJ did not articulate additional reasons in support of his credibility determination, presumably concluding that the medical evidence did not satisfy the *Cotton* test threshold.

Huggett produced medical evidence that reflects extensive evaluations resulting in normal findings. He allegedly began to feel dizziness symptoms in October 2001 for which he underwent a neurological evaluation by Greg Zarelli, M.D. An MRI of the brain and thoracic spine were completely normal. His physical examination, neurological examination, motor function tests and cerebellar examination were normal. His upper extremity reflexes were normal and symmetric. He had no muscle atrophy. He had normal sensory function except for indications of moderate carpal tunnel syndrome. Dr. Zarelli thought Huggett had benign positional vertigo syndrome possibly related to inner-ear dysfunction. Tr. 131, 141-44. An otolaryngologist, however, did not think that Huggett's symptoms represented vestibulopathy. Tr. 165.

9 - FINDINGS AND RECOMMENDATION

Huggett saw Sally Niles, M.D., a physiatrist in December 2001. Dr. Niles obtained negative results on a neurological examination and Huggett's balance and strength were good. She recommended aerobic exercise and breathing into a bag, in case the dizziness spells represented hyperventilation syndrome. Tr. 135.

In January 2002, Dr. Zarelli noted that:

> In light of the fact that he has been evaluated by ENT, physiatry and neurology, and in light of the fact that all of his diagnostic studies are normal, I have no other options open to the patient for treatment of this condition.

Tr. 134.

In February 2002, Huggett sought a second neurology opinion from Stephen Gancher, M.D. Huggett's physical examination was normal and Dr. Gancher found no cause for Huggett's episodic symptoms. He opined that further diagnostic studies were not indicated in light of the "large negative workup." Tr. 166.

In April 2002, Huggett underwent a neuropsychological evaluation by James Bryan, Ph.D., for memory problems, depression and somatoform disorder. Huggett demonstrated "notable dramatism" in his description of physical symptoms and communication of pain behavior. Tr. 175. He told Dr. Bryan that he continually experiences severe dizziness, to the point of almost passing out, for 20 seconds' duration every two minutes. He reported that he forgets 95% of what he hears and does. Tr. 170-71.

Dr. Bryan administered a battery of psychological tests. Huggett's scores on the Test of Memory Malingering indicated that he gave valid effort. His scores on the Wechsler Adult Intelligence Scale indicated average intellectual functioning, average working memory and low

10 - FINDINGS AND RECOMMENDATION

average information-processing speed. He consistently performed complex verbal instructions without difficulty. He had average verbal comprehension, fluency and initiation. His Performance IQ scores were average to high average. Tr. 176-77.

On the Wechsler Memory Scale, Huggett had scores in the average range for learning and retention immediately following presentation. His scores were in the average range for recall and retention of auditory information after a 30-minute delay. The only indication of sub-average ability was borderline scores for recall and recognition of visual information, such as recognition of faces, after a 30-minute delay. Tr. 178.

On the Minnesota Multiphasic Personality Inventory (MMPI-II), Huggett responded with a valid profile that suggested histrionic personality traits. There was a very high emphasis on somatic pain and physical illness indicating extreme reliance on physical symptoms to a maladaptive extent. Tr. 178.

Dr. Bryan concluded that the test results indicated "severe functional interference from depression and a somatoform-related condition." Tr. 178. He diagnosed Conversion Disorder and Major Depressive Disorder of at least mild severity. He assigned a global assessment of functioning score (GAF) of 60. A GAF between 51 and 60 is used to indicate moderate symptoms or moderate difficulty in social, occupational or school functioning. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, (4th ed. 2000) (DSM-IV).

In July 2002, Huggett underwent a neurological examination by Christopher Ginocchio, M.D., who obtained normal results. Dr. Ginocchio opined that Huggett's dizziness episodes could not reasonably be diagnosed as benign paroxysmal positional vertigo, labyrinthitis or vestibular neuronitis. He obtained negative results from 24-hour EEG monitoring for seizure activity, as well.

11 - FINDINGS AND RECOMMENDATION

Dr. Ginocchio remained at a loss to explain Huggett's symptoms after examinations in September and December 2002, essentially reaching no diagnosis. Tr. 247-56.

In February 2003, Huggett began to receive primary care from Wei-hsung Lin, M.D. In March and April 2003, Huggett underwent a cardiology consultation with Manohar Punja, M.D. The cardiopulmonary evaluation revealed intermittent atrial fibrillation, but Drs. Lin and Punja found no correlation between the monitored fibrillation and contemporaneous reports of dizziness. Tr. 230-31. Dr. Punja concluded there was no connection between Huggett's atrial fibrillation and his dizzy spells. Tr. 318-21. An echocardiogram report indicated that Huggett had a normal heart. Tr. 307-08.

In November 2003, Hugget underwent evaluation by a neurosurgeon, Deborah Syna, M.D. Dr. Syna noted: "Although his examination, as well as MRI and laboratory tests are all within normal limits, it is possible that he has a complex migraine syndrome, although somewhat unlikely." Tr. 236. Dr. Syna had no treatment options for Huggett, but recommended that he exercise and stop smoking and drinking alcohol.

Despite the astounding frequency of the dizziness episodes Huggett asserted, he failed to produce any medical records reflecting direct observation of such an episode by a medical provider during an office visit. *See* Tr. 256. In sum, Huggett's medical records show a history of complaints of severe dizziness and associated symptoms without any organic or neurological explanation.

The threshold requirement of *Cotton v. Bowen* is that the claimant must produce objective medical evidence of an underlying impairment that can reasonably be expected to produce the symptoms he asserts in his testimony. The ALJ is not required to evaluate the credibility of his testimony regarding the severity of symptoms for which he fails to produce such evidence.

12 - FINDINGS AND RECOMMENDATION

Application of the *Cotton* test is difficult in cases alleging somatoform disorders, because the absence of demonstrable organic findings is essential to the diagnosis of a somatoform disorder. *See Stedman's Medical Dictionary* 510 (26th ed. 1995); 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.07. To the extent Huggett's dizziness, pain and physical limitations are psychologically based or enhanced, it is not realistic to expect him to produce objective medical evidence of an organic cause.

Accordingly, the ALJ's adverse credibility determination based solely on the paucity of medical evidence should not be upheld. The Commissioner should determine which, if any of the limitations Huggett described in his testimony are supported by the medical evidence and which, if any can reasonably be expected to arise from his psychological condition(s). The Commissioner should then evaluate Huggett's testimony based on all the factors described in SSR 96-7p instead of relying solely on the medical records.

### B.     Medical Source Statements of Drs. Lin and Ginocchio

Huggett contends the ALJ improperly rejected the medical source statements of Drs. Lin and Ginocchio.

As described previously, Dr. Lin began providing primary care to Huggett in February 2003. At the initial visit, Huggett had a normal physical examination, except his facial expression seemed "somewhat depressed." He had no significant pain or functional limitation. Dr. Lin thought his reported dizziness could be related to his anti-depressant medication and changed his prescription. He felt the headaches did not require medical intervention. Tr. 295.

Dr. Lin saw Huggett in regular monthly follow-up visits in the subsequent months. He altered Huggett's anti-depressant prescriptions to help with depression and headaches and evaluated new symptoms of sore throat and bladder problems. He made findings regarding Huggett's

13 - FINDINGS AND RECOMMENDATION

appearance and mood, which was generally subdued. He monitored Huggett's hypertension and performed chest, back and joint examinations, which were normal. He made no other medical findings. Tr. 273-91.

In December 2003, Huggett reported a motor vehicle accident resulting in whiplash. He initially reported pain in the neck, back and chest. He then developed pain with limited range of motion in the right shoulder. After about one month, he developed pain and limited range of motion in the lumbar spine. While treating these acute conditions, Dr. Lin did not record any findings regarding Huggett's ongoing complaints. Tr. 261-72.

In April 2004, Dr. Lin prepared two worksheets titled Mental Residual Functional Capacity Assessment (MRFC) and Physical Residual Functional Capacity Assessment (PRFC). Tr. 332-36, 337-46. Dr. Lin indicated on the PRFC that Huggett could stand and/or walk for a total of less than two hours, "based on his recurrent problems with dizziness, shakiness and passing out." Tr. 338, 345. He indicated on the MRFC that Huggett was markedly limited in the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms "because of the combination of his depression, his frequent headache and side effects from his anti-depressant and antiepileptic medications." Tr. 333, 336.

As described previously, Dr. Ginocchio evaluated Huggett for episodic dizziness and headaches several times in 2002 and 2003, but remained at a loss to explain his symptoms. On April 29, 2004, Dr. Ginocchio prepared a PRFC, indicating limitations which were notably inconsistent with those found by Dr. Lin. In a handwritten marginal notation, Dr. Ginocchio stated "there is no doubt that the patient is unable to find reliable work because of his symptomatology." Tr. 352.

Huggett contends that the ALJ improperly rejected the foregoing statements from the MRFC and PRFCs of Drs. Lin and Ginocchio.

A treating physician's opinion is given great weight when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques." 20 § C.F.R. § 404.1527(d)(2). An ALJ may reject the opinion of a treating physician that is "conclusory and unsubstantiated by relevant medical documentation." *Meanel v. Apfel,* 172 F.3d 1111, 1114 (9th Cir. 1999) quoting *Johnson v. Shalala,* 60 F.3d 1428, 1432 (9th Cir. 1995).

Dr. Ginocchio repeatedly admitted that he was unable to find objective abnormalities or explain Huggett's symptoms. Dr. Lin obtained normal findings on all the clinical examinations he performed and noted no diagnostic basis for Huggett's "dizziness, shakiness and passing out." Accordingly, the conclusory PRFC statements of Drs. Lin and Ginocchio were not entitled to great weight. The disputed statements were not substantiated by relevant medical documentation.

In addition to the absence of findings by Drs. Lin and Ginocchio to support their statements, the ALJ pointed out that throughout the entire record the diagnostic studies and laboratory tests revealed no basis for most of Huggett's subjective complaints. Huggett disputes this based on the testing administered by Dr. Bryan and his diagnosis of conversion disorder. In addition, Dr. Bryan believed Huggett was only moderately impaired by the conditions he diagnosed as shown by his GAF of 60. Thus, his findings do not provide a basis for their disability opinions.

The ALJ also relied on the RFC assessments of the state agency consulting physicians and psychologists. As noted previously, they are recognized as experts in the evaluation of medical issues in disability claims under the Social Security Act and the Commissioner relies on them to make findings of fact about the nature of a claimant's impairments and the severity of the functional

15 - FINDINGS AND RECOMMENDATION

limitations they impose. 20 C.F.R. § 404.1527(f); SSR 96-6p. Drs. Wimmers and Bates-Smith had the benefit of reviewing all of Huggett's records and concluded that his ability to complete a normal workday and workweek was not significantly impaired. Tr. 199.

In the absence of objective medical evidence to support the disputed statements, the ALJ concluded that the opinions of Drs. Lin and Ginocchio were based primarily on Huggett's subjective description of symptoms. An ALJ may reject a physician's disability opinion that is premised on the claimant's subjective description of symptoms which the ALJ has already properly discredited. *Fair v. Bowen*, 885 F.2d 597, 605 (9th Cir. 1989); *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001). Accordingly, the weight to be given these physician's statements turns in part on the Commissioner's re-evaluation of Huggett's credibility. This re-evaluation is necessarily complicated by plaintiff's diagnosis of conversion disorder. The essence of a conversion disorder is the honestly perceived limitation or pain by the patient with no physical basis for the perception. This absence of physical findings does not invalidate the diagnosis of conversion disorder, and whatever limitations it is found to be causing for Huggett.

In summary, the ALJ properly attributed little weight to the disputed statements of Drs. Lin and Ginocchio and set forth "specific, legitimate reasons for doing so that are based on substantial evidence in the record." *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002) quoting *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989); *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). The Commissioner is not foreclosed from reassessing these opinions after properly evaluating the credibility of Huggett's subjective statements.

### C. Third Party Lay Witness Statement

Huggett contends the ALJ improperly rejected the lay witness statement of his mother, Suzi Carey. Carey completed a third party questionnaire, leaving most of it blank. Tr. 93-104. She noted that Huggett is forgetful and seems to tire very easily. Tr. 94, 96, 103. She did not identify any other functional limitations, but noted that Huggett was "off work due to medical problems." Tr. 103.

Huggett contends Carey's statement corroborates his testimony and the statement of Dr. Lin. Friends and family members and others in a position to observe a claimant's symptoms and daily activities are competent to testify as to the claimant's condition. *Dodrill v. Shalala,* 12 F.3d 915, 918 (9th Cir. 1993). Such testimony cannot be disregarded without comment. *Nguyen v. Chater,* 100 F.3d 1462, 1467 (9th Cir. 1996). If the ALJ wishes to discount lay witness testimony, he must give reasons that are germane to the witness. *Id.*

The ALJ found that Carey credibly described the behavior she observed Huggett demonstrate in her presence. He found that she did not have the medical or vocational expertise to render opinions on how Huggett's impairments impact his ability to work. Tr. 24. This court need not resolve whether Carey is qualified to opine on how Huggett's impairments limit his ability to work because she did not offer such an opinion.

The Commissioner is not foreclosed from assessing Carey's statement as corroboration of Huggett's testimony and the medical source statement of Dr. Lin while reevaluating that evidence on remand.

### D. State Agency MRFC

Huggett contends the ALJ erred by failing to include limitations in his RFC for mental limitations identified by the state agency psychologists in their MRFC. Drs. Wimmers and Bates-

17 - FINDINGS AND RECOMMENDATION

Smith indicated that Huggett had moderate limitations in four categories of function: understanding and remembering detailed instructions; carrying out detailed instructions; maintaining attention and concentration for extended periods; and interacting appropriately with the general public. Tr. 198-99.

The Commissioner argues that the omission of limitations from the RFC was harmless error because the ALJ identified work in the national economy that Huggett can do, which does not require the four abilities.

This issue need not be resolved at this juncture because the Commissioner must reassess Huggett's RFC on remand based on a proper evaluation of his testimony and any other proceedings that she finds appropriate.

### III.     Adequacy of the Vocational Evidence

Huggett contends the ALJ erred by relying on testimony from the VE which he elicited with a hypothetical question that did not reflect all of his limitations.

At step five, the Commissioner must show that the claimant can do other work which exists in the national economy. *Andrews v. Shalala*, 53 F.3d at 1043. The Commissioner can satisfy this burden by eliciting the testimony of a vocational expert with a hypothetical question that sets forth all the limitations of the claimant. *Id.*

This issue cannot be resolved at this juncture. On remand, the Commissioner must reevaluate Huggett's RFC and, if necessary, elicit testimony from the VE with a hypothetical question that accurately reflects all of Huggett's limitations.

18 - FINDINGS AND RECOMMENDATION

## RECOMMENDATION

Based on the foregoing, the Commissioner's determination should be reversed and remanded pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings in accordance with the above findings. I recommend that the Commissioner 1) obtain additional medical evidence with respect to Huggett's diagnosis of conversion disorder; 2) re-evaluate Huggett's credibility if the additional medical evidence indicates that credibility findings based on the absence of objective physical findings are inappropriate with his diagnosis of a conversion disorder; 3) re-evaluate the evidentiary weight reports of Doctors Lin and Ginocchio if the additional medical evidence indicates that medical opinions based solely on the claimant's subjective symptoms are appropriate in cases of conversion disorder; and 4) re-evaluate the MRFC and the hypothetical question presented to the VE, in light of the findings made under recommendations 1-3.

## SCHEDULING ORDER

The above Findings and Recommendation are referred to a United States District Judge for review. Objections, if any, are due May 30, 2006. If no objections are filed, review of the Findings and Recommendation will go under advisement on that date.

A party may respond to another party's objections within 10 days after service of a copy of the objections. If objections are filed, review of the Findings and Recommendation will go under advisement upon receipt of the response, or on the latest date for filing a response.

DATED this 12th day of May, 2006.

_____
Dennis J. Hubel
United States Magistrate Judge